UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHERINE BAUERS-TOY,

                        Plaintiff,

           v.

CLARENCE CENTRAL SCHOOL DISTRICT,

                        Defendant.
_____

REPORT
and
RECOMMENDATION

10-CV-00845A(F)

APPEARANCES:        LAW OFFICE OF LINDY KORN, ESQ.
                              Attorneys for Plaintiff
                              LINDY KORN and
                              CHARLES L. MILLER, II, of Counsel
                              Electric Building
                              535 Washington Street
                              9th Floor
                              Buffalo, New York  14202

                              WEBSTER SZANYI, LLP
                              Attorneys for Defendant
                              MICHAEL P. McCLAREN and
                              KEVIN T. O'BRIEN, of Counsel
                              1400 Liberty Building
                              Buffalo, NY  14202

## **JURISDICTION**

     This case was referred to the undersigned on December 22, 2010, by Honorable

Richard J. Arcara for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendant's motion for summary judgment (Doc. No. 20), filed September 14, 2012.

1

## BACKGROUND

In this employment discrimination action commenced on October 26, 2010, Plaintiff Katherine Bauers-Toy ("Plaintiff" or "Bauers-Toy"), alleges she was discriminated against based on her age and gender by her former employer, Defendant Clarence Central School District ("Defendant" or "the School District"), in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  Plaintiff particularly alleges that after teaching for 23 years in the School District, she was constructively discharged because she was one of the oldest, female teachers in the School District.  Defendant's answer (Doc. No. 5) was filed on December 9, 2010.

On September 14, 2012, Defendant filed the instant motion for summary judgment (Doc. No. 20) ("Defendant's Motion"), supported by the attached Declaration of Kevin T. O'Brien, Esq. in Support of Defendant's Motion for Summary Judgment (Doc. No. 20-1) ("O'Brien Declaration"), with attached exhibits A through W (Docs. Nos. 20-2 through 20-5) ("O'Brien Declaration Exh(s). __"), the Declaration of John P. Ptak in Support of Defendant's Motion for Summary Judgment (Doc. No. 20-6) ("Ptak Declaration"), with attached exhibits A through H (Docs. Nos. 20-7 through 20-8) ("Ptak Declaration Exh(s). __"), the Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Doc. No. 20-9) ("Defendant's Memorandum"), and Defendant's Statement of Undisputed Material Facts (Doc. No. 20-10) ("Defendant's Facts Statement").  On November 5, 2012, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 24) ("Plaintiff's Memorandum"), with the attached Declaration of Charles L. Miller, II, Esq. (Doc. No. 24-

1) ("Miller Declaration"), the Affidavit of Katherine Bauers-Toy (Doc. No. 24-2)

("Plaintiff's Affidavit"), Plaintiff's Local Rule 56.1 Statement (Doc. No. 24-3) ("Plaintiff's

Facts Statement"), and exhibits 1 through 26 (Doc. No. 24-4) ("Plaintiff's Exh(s). __").

On November 28, 2012, Defendant filed the Reply Memorandum of Law in

Support of Defendant's Motion for Summary Judgment (Doc. No. 25) ("Defendant's

Reply"), attaching the Declaration of John P. Ptak in Further Support of Defendant's

Motion for Summary Judgment (Doc. No. 25-1) ("Ptak Reply Declaration"), with exhibits

A and B (respectively, Docs. Nos. 25-2 and 25-3) ("Ptak Reply Exh(s). __").  With the

court's leave, Plaintiff filed on March 23, 2013, Plaintiff's Sur-Reply to Defendant's

Reply to Plaintiff's Memorandum (Doc. No. 29) ("Plaintiff's Sur-Reply").  Oral argument

was deemed unnecessary.

Based on the following, Defendant's Motion should be GRANTED in part, and

DENIED in part.


# FACTS[1]

Plaintiff Katherine Bauers-Toy ("Plaintiff" or "Bauers-Toy"), born in 1955,

commenced full-time employment with Defendant Clarence Central School District

("Defendant" or "the School District"), in 1986, when Plaintiff, who is certified to teach

both earth science and biology, was assigned to Clarence Middle School ("the Middle

School"), where Plaintiff taught earth science for 15 years and chaired the science

department.  Prior to her employment with the School District, Plaintiff had taught for

eight years in other school districts.  As a teacher with the School District, Plaintiff

belonged to the Clarence Teachers' Association ("the Union" or "CTA").  A collective

---

[1] Taken from the pleadings and motion papers filed in this action.

bargaining agreement ("CBA")[2] governed employment relations between the School District and the Union.

As relevant to this action, CBA Article XVII ("Article XVII") provides for use of the Annual Professional Performance Review ("APPR")[3] as a tool for evaluating teacher performance.  The APPR consists of three tracks intended to enhance teacher effectiveness for student success.  Track III[4] "is designed to improve the performance of tenured faculty members who have been identified by their building principals as requiring assistance towards [sic] meeting District expectations."  APPR at 8.  Track III consists of two levels, A and B.  Id.  Level A pertains to skills assistance and "is meant to allow a faculty member and his/her supervisor to focus directly on skills which need further development."  Id.  Level B "consists of intensive assistance for the faculty member involved.  A faculty member will be placed in Track III, Level B only if the building principal believes a significant level of unsatisfactory performance exists."  Id.

While teaching earth science at the Middle School, Plaintiff was involved in various extracurricular activities, including the Invention Convention Competition for 8th grade students, introducing the Middle School's Earth Day Program, working as a state writer developing the curriculum for the School District's New Earth Science Program, and serving, for 12 years, as Regional Director of the New York State Science Olympiad Competition ("Science Olympiad").  During her tenure with the School District, Plaintiff was recognized for her achievements teaching science as evidenced by her receipt of

---

[2] Filed as Ptak Declaration Exh. A.
[3] Filed as Ptak Declaration Exh. E.
[4] In contrast, Track I is "a highly structured model to be used in the evaluation of all probationary, regular substitute, part-time and, under some circumstances (see Track III), tenured faculty members," and consists of observation for the purpose of evaluation by an administrator followed by conference between the administrator and the teacher.  APPR at 7.  Track II "is for tenured teachers who continue to demonstrate all of the District's professional performance expectations" set forth in the APPR and consists of an annual review and professional development project.  Id.

an Excellence in Teaching Award in 1990, induction into the Science Teachers Association of New York State ("STANYS") in 1991, and receipt of the Western Section Service Award from STANYS in 2001.

In 2001, Defendant transferred Plaintiff, against her wishes and without explanation, to Clarence High School ("the High School"), where Plaintiff was not given a regular classroom but was placed in a small office located in the earth science stock room, lacking adequate ventilation, air conditioning, and heating.  Complaint ¶ 13; Plaintiff's Affidavit ¶ 10.  A window was installed in the door to Plaintiff's office through which Plaintiff maintains unspecified School District personnel could "surreptitiously" check on Plaintiff.  *Id*.  During the 2001-02 school year, Plaintiff did not teach a regular class, but was assigned to two lunch duties and "remediation" in which Plaintiff, as the "go to person for all remedial science labs," provided assistance to students who were delinquent in their lab work assignments.  Plaintiff's Dep. Tr.[5] at 27.  Plaintiff estimated she worked with 24 to 26 students in remediation, all of whom, with Plaintiff's assistance, resolved their lab work delinquencies and were able to take their science examinations at the end school year.  *Id.*

For the 2002-03 school year, Clarence High School Principal Joseph Gentile ("Gentile"), purportedly believing Plaintiff was "too valuable to waste" in her previous capacity in remediation, Plaintiff's Dep. Tr. at 27, assigned Plaintiff to teach earth science labs and consumer chemistry,[6] placing Plaintiff in Room 405, and added regular earth science classes the following year.  Through the 2006-07 school year Plaintiff

---

[5] References to "Plaintiff's Dep. Tr." are to the pages of the transcript of Plaintiff's November 14, 2011 deposition , portions of which are filed as O'Brien Declaration Exh. G and Plaintiff's Exh. 26.
[6] Plaintiff describes "consumer chemistry" as "the lowest level of science in the high school.  It was the third credit of science that the district offered to get those kids to graduate."  Plaintiff's Dep. Tr. at 28.

taught earth science classes with related labs, and consumer chemistry classes. Plaintiff also remained assigned to Room 405, until the 2006-07 school when she was reassigned to Room 210 where the roof badly leaked.  Despite Plaintiff's complaints that the leaking roof had damaged the room's floor tiles, causing the floor to buckle, the leak was not fixed.  Just prior to Parent's Night, however, new ceiling tiles were installed to conceal the leak, but the repair failed with the next rainfall when the leak resumed.

In a letter to Clarence Central School District Superintendent Thomas G. Coseo ("Coseo"), dated March 1, 2007 ("March 1, 2007 Letter"),[7] Plaintiff requested an unpaid personal leave of absence, in accordance with § 10.04(c) of the CBA,[8] for the 2007-08 school year. Plaintiff's stated reasons for the request included acting as executrix of her late father's estate, caring for her ailing mother who had suffered a heart attack, a stroke, and had dementia, Plaintiff's own health concerns including anticipated foot surgery with three months recovery, and two opportunities for professional experience consisting of travel to Mexico and Australia to visit geological formations.  Plaintiff stated she intended to return for the 2008-09 school year at which time she would resume teaching earth science, and that despite the leave, she would continue as Director of the Science Olympiad hosted at the High School, noting she had already submitted the necessary paperwork for the Science Olympiad.  The request was granted and Plaintiff did not teach during the 2007-08 school year.

---

[7] Filed as Ptak Declaration Exh. B.
[8] Although a copy of the CBA in effect for 2008-2012 is filed as Ptak Declaration Exh. A, and no copy of the CBA in effect for the 2007-08 school year is in the record, Ptak maintains that Plaintiff's request for a one year leave of absence was pursuant to § 10.04(c) of the CBA, Ptak Declaration ¶¶ 5-6, strongly implying § 10.04(c) was essentially the same for all relevant years, providing "[t]he School District may grant an unpaid leave of absence for up to one (1) year."

By letter to Coseo dated March 11, 2008 ("March 11, 2008 Letter"),[9] Plaintiff

requested a second unpaid personal leave of absence for the 2008-09 school year to

allow Plaintiff to meet continuing family obligations, explaining that her mother had had

another heart attack and then fell and broke her hip, that Plaintiff remained occupied

with managing the affairs of her father's estate, and was unable to "physically and

mentally continue to perform 2 fulltime [*sic*] jobs."  March 11, 2008 Letter at 1.  Despite

requesting an additional year of leave, Plaintiff also stated in the same letter that she

intended to "again" act as "Regional Coordinator for the Science Olympiad competition

for 2009 . . . . "  *Id.*  On April 9, 2008, however, School District Personnel Director John

Ptak ("Ptak"), met with Plaintiff and her husband, Tim Toy, and advised that the School

District was not extending leave for another year for anyone who had requested an

extension, including Plaintiff.  Plaintiff responded that her request had been based on

concerns for her mother's health and "her own migraine headaches."  April 9, 2008

internal note by Ptak.[10]  Ptak also discussed with Plaintiff her retirement, advising that

her pay for the three highest consecutive years would be used to calculate her

retirement pay.  *Id.*  At the meeting's conclusion, Plaintiff, accompanied by her husband,

reported to Gentile's office to discuss course options for the 2008-09 school year.  *Id.*

Plaintiff was given the option of teaching either biology, or earth science and consumer

chemistry, similar to what Plaintiff had taught prior to taking her leave of absence.

Plaintiff, who "was tired of teaching the Consumer Chemistry course," Plaintiff's

Responses to Defendants' First Set of Interrogatories ("Interrogatories Response"),[11]

Response 3.c, chose biology, and was assigned to teach in Room 420, where one

---

[9] Filed as Plaintiff's Exh. 10.
[10] Filed as Plaintiff's Exh. 11 and O'Brien Declaration Exh. K.
[11] Filed as O'Brien Declaration Exh. E.

Karen McCaddam ("McCaddam") had recently taught biology before retiring at the conclusion of the 2007-08 school year.  Although Plaintiff was certified to teach biology, and had taught biology prior to her employment with the School District, Plaintiff had not previously taught biology for the School District.

By letter to Plaintiff dated April 14, 2008 ("April 14, 2008 Letter"),[12] Ptak advised that Plaintiff was required to give notice by May 1, 2008, of her intent to return to teach for the upcoming 2008-09 school year, or Plaintiff would be considered as having resigned.  Plaintiff checked the spot indicating she intended to return to her teaching position for the upcoming school year, signed the statement and dated it April 18, 2008.

Other than stopping in on a few days during the summer of 2008 to prepare Room 420 for the upcoming school year, Plaintiff was not at the High School until August 2008 when all teachers were required to report.  While attending a meeting of the biology teachers at the High School on August 29, 2008, the first teacher workday for the 2008-09 school year, Plaintiff was summoned to Gentile's office for a meeting. Another biology teacher, Frank Cantie ("Cantie"), who was also the Union president, accompanied Plaintiff to the meeting with Gentile, who informed Plaintiff that the parents of  14 to 16 students had complained, "based solely on plaintiff's reputation," Defendant's Memorandum at 2, about having Plaintiff for a teacher and requested their children be reassigned to a different teacher.  Plaintiff was never told who made the complaints nor was Plaintiff's request to see the complaints granted in contravention of what Plaintiff maintains was the custom for the High School.  No students were reassigned to different classes at that time, and the High School nevertheless permitted Plaintiff to teach the biology courses as she had selected in April 2008.

---

[12] Filed as Plaintiff's Exh. 12.

Defendant maintains that after the 2008-09 school year commenced, complaints about Plaintiff's teaching continued to be received by the School District.  At a September 8, 2008 meeting between Plaintiff, Gentile, Clarence High School Assistant Principals Bob Moore ("Moore"), and Sharon Webber ("Webber"), Plaintiff was advised by Gentile that several students had complained they were unable to hear Plaintiff in the classroom, that Plaintiff was "off-task" in her teaching, and wanted to know when a quiz would be given.  Interrogatories Response 3.g.  When Plaintiff asked for the names of the students who complained about not being able to hear her so that she could change their seats, only one name was provided.  Plaintiff maintains the acoustics in Room 420, to which she was newly assigned, were very poor, attributing the issue to the rooms' "very high ceilings" and the fact that several ventilation exhaust fans were located on the roof directly above the room.  Plaintiff's Affidavit ¶ 16.  The room was also cold, which Plaintiff maintains exacerbated her edema of the vocal cords, further making it difficult for Plaintiff to sufficiently project her voice to compensate for the room's poor acoustics.

At a meeting with Union representative Paul Runfola ("Runfola"), on September 9, 2008, Plaintiff was advised that Coseo was offering Plaintiff an unpaid leave of one and a half years.  According to Plaintiff, because she was then 53 years old, the unpaid leave would have allowed her to remain a School District employee until she reached age 55, at which point the School District anticipated Plaintiff would retire and could be replaced by a younger teacher.  Plaintiff's Affidavit ¶ 17.  Plaintiff declined the offer because she had already spent the summer preparing for her classes, and accepting the offer would have meant forgoing an additional six months salary beyond what she

would not have received had her request to extend her leave of absence for the 2008-09 school year been granted.  Plaintiff maintains the offer was never put in writing. Plaintiff's Affidavit ¶ 17.

Repeated complaints about Plaintiff's teaching prompted Principal Gentile to observe one of Plaintiff's classes, and when his observations confirmed the complaints, Gentile attempted to assist Plaintiff with her lesson preparation.  On September 10, 2008, various administrative personnel at the High School commenced random observations of Plaintiff's teaching.  On October 6, 2008, after observing Plaintiff several times, Gentile requested Plaintiff provide him with unit plans, daily lesson plans, and sample tests to assist Gentile's observations.  Defendant maintains, and Plaintiff does not dispute, that Plaintiff did not fully comply with the request that she provide Gentile with unit and daily lesson plans and sample tests.  On October 9, 2008, Plaintiff filed a grievance with the Union ("Union Grievance")[13] complaining that since September 10, 2008, she had been subjected to unscheduled teacher observations and class walk-throughs that were not within the guidelines and directives of the APPR.  Union Grievance.  Plaintiff further complained that the administration was threatening Plaintiff with a Track III placement.  *Id.*  The Union Grievance was dismissed when it was determined that the matter was best resolved at the High School.

In a memo dated October 23, 2008 ("October 23, 2008 Memo"),[14] Gentile informed Plaintiff that he had "taken a quick glance at your lesson plans and made some initial comments to help [Plaintiff][15] fine tune these plans into working documents that [Gentile] requested."  Gentile continued that he would offer further comment the

---

[13] Filed as O'Brien Declaration Exh. M.
[14] Filed as Plaintiff's Exh. 14.
[15] Unless otherwise indicated, all bracketed material has been added.

following week and would use the plans for future observations. October 23, 2008 Memo. Gentile further requested Plaintiff submit by the following Monday "a full unit plan (to assist in curriculum mapping) and a unit assessment test" which Plaintiff had yet to provide. *Id*. Gentile also requested Plaintiff revise the plans she had submitted because they "show almost no direct instruction, an over use [*sic*] of films and a total expectation that students will teach themselves by reading the textbook." *Id*.

In a memo dated October 26, 2008 ("October 26, 2008 Memo"),[16] Gentile advised Plaintiff that because his informal attempts to assist Plaintiff did not stem the receipt of concerns from students and their parents regarding Plaintiff's teaching, the School District was placing Plaintiff on Track III, Level A skill assistance as provided for under Article XVII of the CBA. October 26, 2008 Memo at 1. In addition to informing Plaintiff of her Track III, Level A placement, Gentile advised that "[s]ince the beginning of the school year there have been countless telephone calls from parents, and student complaints to administration, regarding the lack of teaching occurring in your room." *Id*. Gentile described the complaints as including students being unable to hear Plaintiff, Plaintiff being easily sidetracked from lessons, and being unprepared for class. *Id*. Gentile stated his observations of Plaintiff's teaching had confirmed the complaints, and Plaintiff's lack of preparedness for class was "readily apparent," with Gentile observing Plaintiff had not fully complied with his requests for lesson plans, a unit plan and a unit plan. *Id*. Gentile described Plaintiff's lessons as consisting of movies, extended labs that went beyond the allotted time, and quizzes and tests from the textbook that the students were instructed to read on their own, with "no evidence of actual instruction from the teacher." *Id*. Further, "[n]o discussion of student readings, or review for

---

[16] Filed as O'Brien Declaration Exh. R and Plaintiff's Exh. 16.

assessments, is evident in the lesson plans or administrative observations." *Id.*  Gentile

advised Plaintiff needed to demonstrate "appropriate planning and direct instruction

during at least 80% of every class," and listed several resources available to assist

Plaintiff in meeting the goal.  *Id.* Gentile further directed Plaintiff to submit a curriculum

for the school year, unit plans, and copies of all tests to be given, including a mid-year

test based on a Regents format, and suggested several resources Plaintiff could utilize

to accomplish the goal Gentile was setting for Plaintiff's classroom instruction.  *Id.* at 1-

2.  Plaintiff maintains her Track III, Level A placement was intended as discipline.

    Early in November 2008,[17] Plaintiff, intending to file a discrimination complaint in

accordance with the School District's internal policies ("Internal Grievance"), requested

the necessary forms from one Teresa Lawrence ("Lawrence"), who directed Plaintiff to

Ptak.  In an e-mail dated November 6, 2009 ("November 6, 2009 e-mail"),[18] Lawrence

advised Plaintiff that she had passed Plaintiff's request "regarding questions/paperwork

about harassment" to Ptak who was "in a much better position" to advise on such

concerns.

    In a memo dated November 10, 2008 ("November 10, 2008 Memo"),[19] Gentile

advised Plaintiff's lesson plans submitted that day were "much closer to the suggested

model than previous plans," and that Gentile intended to use the lesson plans to

observe Plaintiff throughout the week.  November 10, 2008 Memo.  Gentile also

reminded Plaintiff classes were to include 80% explicit, direct instruction, not including

time spent viewing films or having students work independently on worksheets.  *Id.*

Gentile also reminded Plaintiff she had yet to submit her unit plan, requesting Plaintiff

---

[17] The record does not provide the exact date.
[18] Filed as Plaintiff's Exh. 17.
[19] Filed as O'Brien Declaration Exh. S.

do so as soon as possible.  *Id.*  Also on November 10, 2008, Plaintiff attempted to see Ptak regarding the forms for the internal grievance Plaintiff intended to file with the School District.  Because Ptak was not in his office, and observing the necessary forms on Ptak's desk, Plaintiff entered Ptak's office to retrieve the forms.  Plaintiff maintains Ptak later chided her for retrieving the forms without first discussing the grievance with Ptak.[20]  By memo dated November 12, 2008 ("November 12, 2008 Memo"),[21] Gentile informed that because "there has been no improvement in performance" with the Level A placement, Plaintiff she was being moved to Track III, Level B.  November 12, 2008 Memo.  Gentile further advised Plaintiff to schedule a meeting with him, as well as representatives from the Union and the School District, to establish an Intensive Assistance Team.  *Id.*

In total, Plaintiff's teaching was observed 15 times between September 9 and November 12, 2008, including three times on the same day in early November.  Plaintiff maintains she had not, in her previous 21 years teaching[22] in the School District, been subjected to as many observations.  Complaint ¶ 22.  Plaintiff received observation forms ("Observation Forms")[23] completed either by Gentile or Moore, each of which identified areas for Plaintiff's improvement and contained a line for Plaintiff's signature. Plaintiff, however, refused to sign any of the observation forms because she disagreed with the comments.  Plaintiff, for the first time in more than 22 years with the School District, was not permitted to attend the annual N.Y.S. Science Teachers' Conference held in November 2008.

---

[20] It is not clear from the record whether Plaintiff ever filed her internal grievance with the School District.
[21] Filed as O'Brien Declaration Exh. T.
[22] Plaintiff taught 21 years with the School District, followed by a year of unpaid personal leave of absence, and resumed teaching in what was her 23rd year as a School District employee.
[23] Filed as Pltak Declaration Exh. F.

In an e-mail to Coseo dated November 17, 2008 ("November 17, 2008 e-mail"),[24] CTA President Cantie advised he believed he "might be able to get K. Toy to agree to resignation with the condition of current health insurance status till the end of Feb 2010." Cantie further requested the School District draft a document consistent with the proposal for Plaintiff's signature. November 17, 2008 e-mail.

On November 17, 2008, the Union recommended the School District enter into an agreement with Plaintiff whereby Plaintiff would resign in exchange for health insurance benefits through February 2010, or remove Plaintiff from her teaching position to an in-school suspension monitor position ("ISSM"), and commence a disciplinary proceeding pursuant to New York Education Law § 3020-a ("§ 3020-a"). Plaintiff, upon the advice of the CTA, agreed to resign, rather than be reassigned to the ISSM position and potentially face an expensive § 3020-a proceeding. The School District then drafted a Memorandum of Agreement ("Memorandum of Agreement"),[25] which provided that the School District would provide Plaintiff with full medical coverage through February 10, 2010, and Plaintiff would agree to resign effective December 3, 2008. Memorandum of Agreement. The Memorandum of Agreement further stated that "[t]he Employee agrees that she has been fully and fairly represented by the Union in this proceeding, including in the negotiation of the terms of this Agreement that her agreement to these terms is voluntary and not the result of coercion or any undue influence." *Id.* On November 18, 2008, Plaintiff signed the Memorandum of Agreement and, on November 19, 2008, Plaintiff submitted her letter of resignation ("Letter of

---

[24] Filed at Plaintiff's Exh. 19; and Ptak Declaration Exh. G.
[25] Filed as Ptak Declaration Exh. H.

Resignation"),[26] which Plaintiff advised would be effective as of December 3, 2008.

Plaintiff's Letter of Resignation stated "[t]his letter will serve as notice of my resignation

from my teaching position, of [*sic*] good standing, from the Clarence Central School

District."  Letter of Resignation.  Also on November 18, 2008, Plaintiff left a handwritten

note on the "white board" in her classroom ("November 18, 2008 Note"),[27] advising that

having taught in the School District for 23 years, she would miss her students whom she

was pleased to have met, thanking the students for allowing her to "enrich" their lives

with her teaching skills and knowledge.  The message continued that "no one" could

"rob" Plaintiff of who she is or the "wonderful" students Plaintiff taught for more than 30

years,[28] concluding that "[t]his district may have empowered the whiners for a couple of

months, but I will be successful at anything I choose!"  November 18, 2008 Note.

By letter to Coseo dated November 29, 2008 ("November 29, 2008 Letter"),[29]

Plaintiff requested the School District investigate her complaints of age and gender-

based discrimination.  Plaintiff's last day of teaching in the School District was

December 3, 2008.

On January 9, 2009, Plaintiff filed with the New York State Division of Human

Rights ("NYSDHR") a Verified Complaint in which Plaintiff complained the School

District had subjected her to employment discrimination on the basis of her age and

sex.  After investigating the claim, NYSDHR issued its determination on March 24,

---

[26] Filed as Plaintiff's Exh. 21.

[27] Filed as O'Brien Declaration Exh. U.

[28] Although Plaintiff's resignation was tendered during her 23rd year as a School District employee, Plaintiff had taught in other school districts for eight years prior to teaching with the School District and, as such, had taught for more than 30 years when she resigned.

[29] Filed as Plaintiff's Exh. 22.

2010, finding no probable cause to support employment discrimination based on age or sex, nor a retaliation claim, dismissed the Verified Complaint.

Despite signing the Memorandum of Agreement and submitting her Letter of Resignation, on February 24, 2009, Plaintiff applied to receive unemployment benefits from New York Department of Labor ("DOL"), indicating the reason for her job loss as "discharged/unable to meet employer standards."  New York Unemployment Insurance Appeal Board ("Appeal Board") Decision[30] at 2.  Plaintiff initially received unemployment benefits until the DOL issued a determination that Plaintiff was disqualified for the benefits.  Plaintiff appealed the DOL's initial determination and, on July 14, 2009, the Appeal Board affirmed the DOL's initial determination disqualifying Plaintiff from receiving unemployment benefits, effective December 4, 2008, and charging Plaintiff with an overpayment of $ 2,430 in benefits which Plaintiff was ordered to repay.  Appeal Board Decision at 3.  In reaching this decision, the Appeal Board found that Plaintiff's reasons for resigning from her teaching position with the School District were "personal and non-compelling," and that Plaintiff knew when she applied for benefits that she had resigned, rather than been discharged.  *Id.*  Despite its determination that Plaintiff's voluntary resignation rendered Plaintiff ineligible for unemployment benefits, the Appeal Board also found that the evidence established that "in the three months before her resignation, [Plaintiff] was subjected to a pattern of fairly close scrutiny by and demands from her principal.  Although I have no doubt that the principal was trying to intimidate [Plaintiff] (based upon my evaluation of the testimony, the numerous classroom observations, the list of so-called complaints from students and parents and other documentation presented at the hearings) . . . [t]here is a lack of substantial evidence to

---

[30] Filed as Plaintiff's Exh. 24.

prove [Plaintiff's] allegation that she was specifically threatened with disciplinary proceedings based on issues of poor performance." *Id.* at 2-3.

## DISCUSSION

**1.   Summary Judgment**

Defendant argues in support of summary judgment that Plaintiff's claims are time-barred insofar as they pertain to alleged discriminatory acts occurring more than 300 days before Plaintiff filed her Verified Complaint, *i.e.*, prior to April 8, 2008, Defendant's Memorandum at 6-8, that Plaintiff cannot establish a *prima facie* case of employment discrimination based on her age or gender, *id.* at 8-16, that even if Plaintiff can establish a *prima facie* case for employment discrimination, the School District has articulated a legitimate, clear and specific non-discriminatory reason for its actions, *id.* at 16-17, that Plaintiff cannot establish any of the School District's actions were discriminatory, *id.* at 17-19, that Plaintiff has also failed to establish a hostile work environment claim, *id.* at 19-20, or a retaliation claim, *id.* at 20- 21, and that in any event, Plaintiff's employment discrimination claims are barred by the *Faragher/Ellerth* defense.[31]  *Id.* at 22-23.  In opposition to summary judgment, Plaintiff does not dispute that any actionable event occurring prior to April 8, 2008 is time-barred, Plaintiff's Response at 7, but contends Plaintiff has established a *prima facie* case of discrimination based on both age and gender, *id.* at 7-9, the School District's asserted legitimate, non-discriminatory reasons are mere pretext, *id.* at 9-15, Plaintiff has established a *prima facie* case of hostile work environment, *id.* at 15-16, Plaintiff has

---

[31] The *Faragher/Ellerth* defense provides for strict liability of an employer for supervisory harassment culminating in a tangible adverse employment action. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 765 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 808 (1998)).

established a *prima facie* case of retaliation, *id.* at 16-18, which is not defeated by the

*Faragher/Ellerth* defense.   *Id.*   In further support of summary judgment, Defendant

maintains Plaintiff cannot establish a *prima facie* case of either age or gender

discrimination because she has failed to allege a single adverse employment action,

Defendant's Reply at 3-6, does not dispute Defendant's legitimate and non-

discriminatory reasons articulated in support of its actions, *id.* at 6-8, and has failed to

allege a retaliation claim.   *Id.* at 8.   In further opposition to summary judgment, Plaintiff

asserts that although any alleged discriminatory acts occurring prior to April 8, 2008 are

time-barred, the court may nevertheless consider such acts as evidence in support of

Plaintiff's otherwise timely employment discrimination claims, Plaintiff's Sur-Reply at 3,

Plaintiff has established a *prime facie* case of age and gender based employment

discrimination, *id.* at 4-5, as well as retaliation, *id.* at 5-6, and Defendant's proffered

legitimate, non-discriminatory reasons for its actions are mere pretext.   *Id.* at 6-9.

　　　Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).   The court is required to construe the evidence in the light most favorable to the

non-moving party.   *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).   The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a

material fact is "genuine," that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "A fact is material if it 'might affect the

outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of

Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.

Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes

Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).

2.      **Employment Discrimination**

Plaintiff claims she suffered employment discrimination based on her age and

gender when Defendant subjected Plaintiff to disparate treatment, creating a hostile

work environment, and, when Plaintiff filed a grievance with the Union complaining

about the asserted disparate treatment and hostile work environment, retaliated against

Plaintiff by placing her on Track III supervision.   Plaintiff's employment discrimination

claims are brought pursuant to Title VII (gender), and the ADEA (age), both of which are

analyzed pursuant to the same burden-shifting test.   *Terry v. Ashcroft*, 336 F.3d 128,

141 (2d Cir. 2003) (citing *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)).   Upon

meeting this *de minimus* burden of establishing a *prima facie* case of employment

discrimination, *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 316-17

(2d Cir. 1999) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.

1994)), the burden shifts to Defendant to offer a legitimate, non-discriminatory reason

for the challenged actions.   *Terry*, 336 F.3d at 138 (citing *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792, 802 (1973) (Title VII); and *Schnabel*, 232 F.3d at 87 (ADEA)).

Once Defendant has asserted a neutral reason for the alleged discriminatory action,

"the inference of discrimination raised by the prima facie case then drops out and the

plaintiff must prove by a preponderance of the evidence that the employer's proffered

reason is merely a pretext for discrimination."   *Brennan*, 192 F.3d at 317 (citing *St.

Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).   *See also Terry*, 336 F.3d at

138 ("'to defeat summary judgment, the plaintiff's admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on

20

discrimination.'" (citing *Stern v. Trustees of Columbia*,131 F.3d 305, 312 (2d Cir. 1997))).

A.   ***Prima Facie* Case**

1.   **Disparate Treatment**

Plaintiff claims she was subjected to disparate treatment based on her age and gender.  To establish a *prima facie* case of employment discrimination based on disparate treatment in violation of Title VII or the ADEA, Plaintiff must demonstrate (1) she belonged to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Terry*, 336 F.3d at 137-38 (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (ADEA); and *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (Title VII)).

In the instant case, it is not disputed that Plaintiff, as a 53 year-old female, is a member of two protected classes, including gender and age.  Accordingly, Plaintiff meets the first of four criteria for a *prima facie* disparate treatment case of employment discrimination based on age and gender.  The parties, however, disagree as to whether Plaintiff was qualified for the teaching position from which she resigned, with Defendant maintaining Plaintiff's job performance was deficient.  Also in dispute is whether Plaintiff's Track III placement constituted an adverse employment action and, if so, whether such placement was causally related to Plaintiff's membership in a protected class.  A review of the evidence submitted in connection with Defendant's motion establishes no genuine issues of material fact with respect to the second factor as the

record establishes Plaintiff was, at the time of her resignation, qualified for her position, there are genuine issues of material fact as to the third factor pertaining to whether Plaintiff suffered an adverse employment action, but Plaintiff's evidence fails to establish any genuine issue of material fact with regard to the fourth factor, *i.e.*, whether any adverse employment action suffered by Plaintiff was causally related to Plaintiff's membership in a protected class.

### a.   Qualified for Teaching Position

Defendant does not dispute that Plaintiff was certified to teach biology, but maintains that Plaintiff has failed to establish that her job performance during the 2008-09 school year was satisfactory.  Defendant's Memorandum at 12-13.  The evidence on which Defendant relies to establish that Plaintiff's job performance was less than satisfactory includes that (1) both students and parents complained to the School District about being assigned to Plaintiff's biology classes, even before the 2008-09 school year commenced; (2) once school resumed for the 2008-09 school year, Defendants received numerous complaints that Plaintiff was not adequately teaching lessons; (3) upon observing Plaintiff's classes, Principal Gentile found such complaints were valid; (4) despite Gentile's informal attempts to assist Plaintiff with her classroom performance, including requesting to see lesson plans and class curricula, Plaintiff failed to cooperate and on one occasion submitted an earth science lesson plan; and (5) although Plaintiff's union, the CTA, was aware of the School District's actions, the Union did not oppose or otherwise challenge them.  *Id.*  In opposition, Plaintiff relies on her certification to teach biology, her receipt of several awards and commendations

throughout her teaching career in recognition of Plaintiff's excellent teaching, serving for 12 years as Regional Director of the Science Olympiad, and her "proven record of equipping those who took her classes to face the rigors of state level examinations for the subjects she taught." Plaintiff's Memorandum at 1, 8; Plaintiff's Sur-Reply at 1. Defendant has not further argued on this point in support of summary judgment.

An employment discrimination plaintiff "need not do much to establish [her] qualification for the position [s]he holds . . . ." *Donnelly v. Greenburgh Central School District No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (citing *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)). "Moreover, 'the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision.'" *Id.* (quoting *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001)). Significantly, "[i]t is unusual for the plaintiff to fail to meet this burden." *Id.* A sufficient showing of "qualification" to shift the burden for the alleged adverse employment action to the employer does not require the plaintiff to "'show perfect performance or even average performance.'" *Gregory*, 243 F.3d at 696 (quoting *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir. 1978)). "Instead, she need only make the 'minimal showing' that '*she possesses the basic skills necessary for the performance of the job.*'" *Id.* (quoting *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991) (italics in original; additional quotation and alteration omitted)). This is because the qualification prong is intended to eliminate the most common, nondiscriminatory reasons for rejecting the plaintiff. *Id.* (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); and

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44

(1977) ("[T]he *McDonnell Douglas* formula . . . demand[s] that the alleged discriminatee

demonstrate at least that his rejection did not result from the two most common

legitimate reasons on which an employer might rely to reject a job applicant: an

absolute or relative lack of qualifications or the absence of a vacancy in the job

sought.")).

If the employer has already hired the employee into the job in question, "the

inference of minimal qualification is, of course, easier to draw than in a hiring or

promotion case because, by hiring the employee, the employer itself has already

expresses a belief that she is minimally qualified."  *Gregory*, 243 F.3d at 696.

Furthermore, where, as here, "the employer has retained the plaintiff for a significant

period of time and promoted her, the strength of the inference that she possesses the

basic skills required for her job is heightened."  *Id.*  "An employer's dissatisfaction with

even a qualified employee's performance may, of course, ultimately provide a

legitimate, non-discriminatory reason for the employer's adverse action.  But the crucial

point remains the same: the qualification prong, as to which the initial burden lies on

plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and

disprove an employer's explanation that inadequate ability or performance justified the

job action at issue."  *Id.* at 696-97.  Nevertheless, "there will also be circumstances in

which a plaintiff's performance is so manifestly poor as to render her unqualified for

continued employment and thereby defeat her *prima facie* case."  *Id.* at 697 n. 7 (citing

*McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (finding plaintiff failed to

establish *prima facie* case for employment discrimination where, after probation period,

employer rated plaintiff's work unsatisfactory on a majority of criteria, most of which plaintiff failed to contest)).

In the instant case, given that Plaintiff is certified to teach biology, had successfully taught science for more than 30 years, including 22 with the School District, prior to her resignation on December 3, 2008, during which time she received several awards and commendations for her teaching, and had been selected as the Regional Director of the Science Olympiad for 12 years, and in light of the Second Circuit's observation that "[i]t is unusual for a plaintiff to fail to meet this standard" on the qualification prong for establishing a *prima facie* case of employment discrimination, *Donnelly*, 691 F.3d at 147, Plaintiff has met her burden to establish the qualification element of her claims.  Although the evidence on which Defendant relies to establish that Plaintiff's job performance was less than satisfactory, Defendant's Memorandum at 12-13, is irrelevant to whether Plaintiff possessed the basic qualification for her teaching position, such evidence is pertinent to whether Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's Track III placement and ultimate recommendation that Plaintiff resign.

### b.    Adverse Employment Action

Plaintiff claims she was subjected to adverse employment actions when Defendant assigned her to teach in a room with poor acoustics, subjected Plaintiff to unwarranted observations of her teaching, placed her on the Level III teacher performance evaluation track which increased the amount of Plaintiff's administrative work, refusing to allow Plaintiff to address the alleged complaints made by students and

their parents, the authenticity of which Plaintiff also challenges, and subsequently

constructively discharged Plaintiff by requiring Plaintiff choose between accepting the

ISSM position while the School District commenced a § 3020-a disciplinary proceeding,

or tender her resignation in exchange for the School District agreeing to provide Plaintiff

with health care benefits through February 2010.  Complaint ¶¶ 31 and 36.  In support

of summary judgment, Defendant argues that neither the School District's denial of

Plaintiff's request for an additional year of personal leave of absence, the increased

supervision of Plaintiff's teaching, nor the resignation offered to Plaintiff by Defendant,

which the CTA recommended Plaintiff accept, qualifies as an adverse employment

action.  Defendant's Memorandum at 14-15.  According to Defendant, Plaintiff ultimately

chose to resign rather than to make the required effort to improve her teaching.  *Id.* at

16.  In opposition to summary judgment, Plaintiff asserts she was subjected to adverse

employment actions when she was assigned to teach in an acoustically deficient

classroom, subjected to unnecessary classroom observations, placed on Track III

supervision, and ultimately given a choice to resign with her health care coverage intact

for 14 months or be reassigned to an ISSM position while the School District

commenced a § 3020-a disciplinary proceeding against her.  Plaintiff's Memorandum at

1-5.  In further support of summary judgment, Defendant argues that none of these

incidents qualify as adverse employment actions for purposes of an employment

discrimination action.  Defendant's Reply at 3-6.  Defendant reiterates that rather than

suffering an adverse employment action, Plaintiff was denied an extended leave of

absence based on established School District Policy, subjected to additional supervision

because of the School District's legitimate concerns as to Plaintiff's teaching, and

Plaintiff chose to resign rather than make any effort to improve her teaching.  *Id.* at 6.  In further opposition to summary judgment, Plaintiff points to Defendant's denying her request for another year leave of absence, increased scrutiny of Plaintiff's teaching, and performance improvement plans as examples of adverse employment actions. Plaintiff's Sur-Reply at 4-5.

An "adverse employment action" refers to "a 'materially adverse change' in the terms or conditions of employment."  *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) (citing cases).  "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Id.* (quoting *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).  Examples of such "materially adverse change" include "'a termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'"  *Id.*  In the instant case, a reasonable jury could not find materially adverse any of the employment actions on which Plaintiff relies to establish the third prong of her *prima facie* case of employment discrimination.

Insofar as Plaintiff argues the CBA did not, as Defendant maintains, prohibit Defendant from granting Plaintiff's request for a second year leave of absence, which is corroborated by Defendant's proffer to Plaintiff on September 9, 2008, of an additional year and a half leave of absence, Plaintiff's Sur-Reply at 4-5, the School District's denial of such request did not result in a materially adverse change in the terms and conditions of her employment; rather, Plaintiff was required to resume teaching, and was even

offered the opportunity to teach the same classes she taught immediately prior to her 2007-08 leave of absence.  Nor is there any indication that Plaintiff's return to the classroom in September 2008 was accompanied by any reduction in pay or loss of benefits.  Although Plaintiff was assigned to a different classroom, Room 420, which Plaintiff maintains was acoustically challenged, Plaintiff herself admitted that McCaddam had taught biology in the same room the previous year, thereby indicating Room 420 was designated at the High School as a biology classroom.

With regard to the increased observation of Plaintiff's teaching, largely implemented by Principal Gentile, Plaintiff fails to explain, and the record does not indicate, how such observations had a materially adverse effect on her teaching, even assuming, *arguendo*, that the observations prior to October 26, 2008, when Plaintiff was placed on Track III, Level A supervision, were beyond the scope of the APPR's provisions.  Plaintiff does not explain how submitting for Gentile's review copies of daily lesson plans, unit plans, and unit tests, documents which Plaintiff would have had to prepare in anticipation of teaching her regular classes, so altered the conditions of her employment as to be considered materially adverse.  Nor has Plaintiff explained how complying with job performance improvement plans, issued in connection with Plaintiff's Track III placement, rises to an adverse employment action.  Significantly, Track III placement is undertaken prior to filing a charge under § 3020-a, which is a disciplinary procedure.

Nevertheless, a trier-of-fact could find that the choice with which Defendant presented Plaintiff on November 17, 2008 to either accept a reassignment to the in-school suspension monitor position while the School District pursued a § 3020-a

disciplinary proceeding against Plaintiff, or tender her resignation in exchange for Defendant providing Plaintiff with health insurance through February 2010, was an adverse employment action.  Simply put, the so-called "choice" required Plaintiff to decide whether to accept a demotion and defend against disciplinary proceedings, or resign.  A reasonable jury could find that such decision was intended to force Plaintiff's involuntary resignation, which would constitute an adverse employment action. *Galabya*, 202 F.3d at 640.

Accordingly, the evidence in the record could be construed as demonstrating Plaintiff was subjected to an adverse employment action, the third prong of a *prima facie* case of employment discrimination, and the court considers whether, assuming Plaintiff has suffered an adverse employment action, such action was causally related to Plaintiff's membership in a protected class based on her age or gender.

### c.    Causally Related

Defendant argues that even if the evidence establishes Plaintiff was qualified for her teaching position, and suffered an adverse employment action, Plaintiff offers "no 'concrete particulars' sufficient to establish that any of the alleged adverse employment actions were based upon her age or gender" so as the demonstrate the requisite causal relationship.  Defendant's Memorandum at 11.  Defendant maintains Plaintiff's failure to provide the necessary link between the alleged adverse employment actions and Plaintiff's membership in a protected class so as to give rise to an inference of discrimination is consistent with the fact that the School District's actions were "fully compliant with the CBA," and the CTA was aware of Plaintiff's situation from August

2008 until her resignation, as well as Plaintiff's statement made at her examination of claims pursuant to N.Y. Gen. Mun. Law § 50-h given in connection with Plaintiff's administrative complaint that Plaintiff did not believe the School District denied her request for a second leave of absence because of her age or gender.  *Id.* at 11-12 (citing Plaintiff's 50-h Tr.[32] at 39 (School District's attorney questioning whether Plaintiff believed she was "denied a second consecutive year of unpaid personal leave because of your age or sex?" and Plaintiff responding "No, I do not believe that's correct.")).

In opposition to summary judgment, Plaintiff argues circumstantial evidence in the record supports an inference of employment discrimination based on age or gender, including that Plaintiff was "one of the oldest female teachers," that it was within the School District's discretion whether to grant Plaintiff a second consecutive year of unpaid personal leave of absence as nothing in the CBA forbade the School District from granting the request, and that Plaintiff testified at her 50-h examination that she attributed her Track III placement to the fact she was Gentile's "target" for the 2008-09 school year because she was the oldest female teacher in the department.   Plaintiff's Response at 8-9.  Plaintiff also relies on statements contained in her November 29, 2008 Letter in which she requested School District Superintendent Coseo investigate her claims of employment discrimination based on age and gender.  Plaintiff's Response at 9 (referencing November 29, 2008 Letter).   According to Plaintiff, when she entered Ptak's office to retrieve the required forms for filing an internal complaint with the School District regarding the alleged employment discrimination, Ptak stated "women don't do that to John Ptak," a response which Plaintiff maintains was a "show"

---

[32] References to "Plaintiff's 50-h Tr." are to the page of the transcript of Plaintiff's March 16, 2009 examination pursuant to N.Y. Gen. Mun. Law § 50-h, given in connection with her administrative claim, portions of which are filed as O'Brien Declaration Exh. F, and as Plaintiff's Exh. 25.

for one Kevin McCuen ("McCuen"), the Union's representative at the High School ("Head Building Represenative").  *Id.* at 9 (referencing Plaintiff's 50-h Tr.[33] at 87-88).

In further support of summary judgment, Defendant argues Plaintiff has failed to allege or point to any evidence that Defendant has treated Plaintiff "less favorably than a similarly situated employee outside [the] protected group."  Defendant's Reply at 4 (quoting *Rosinski v. American Axle & Mfg., Inc.*, 663 F.Supp.2d 197, 204 (W.D.N.Y. 2009) (internal quotation omitted)).  According to Defendant, Plaintiff's sole evidence in this regard is her conclusory statement at the 50-h examination that Plaintiff believed she was placed on Track III supervision based on her age and gender only because she is "older,"  *id.* (citing Plaintiff's Statement of Facts ¶ 63 (referencing Plaintiff's 50-h Tr. at 83)), which is insufficient to establish employment discrimination.  *Id.*  Defendant further maintains that Plaintiff's observation that the School District's policy not to grant a second year of consecutive leave of absence is discretionary does not detract from the fact that such policy has been in place since the 2001-02 school year, and is consistent with the CBA.  *Id.*  That Plaintiff failed to fully comply with her placement on Track III supervision is, according to Defendant, consistent with Plaintiff's statement handwritten on a "whiteboard" in her classroom the same day Plaintiff submitted her resignation, in which Plaintiff refers to "whiners" whom Plaintiff identified in her deposition as parents and students who complained about Plaintiff, and who were "empowered" by the School District.  *Id.* at 5-6.

In further opposition to summary judgment, Plaintiff maintains that the other three female employees who returned from leave for the 2008-09 school year were younger

---

[33] The court notes that page 87 of Plaintiff's 50-h transcript is not found among the pages filed by either Plaintiff or Defendant, although Defendant does not challenge Plaintiff's representation of the contents of page 87.

than Plaintiff and "were not harassed or scrutinized" as Plaintiff was upon her return. Plaintiff's Sur-Reply at 4.  According to Plaintiff, when she turned down the School District's offer of September 9, 2009, made only 12 days after Defendant advised Plaintiff of complaints allegedly made by several parents of students who did not want to be assigned to Plaintiff's biology class, "Defendant engaged in a series of selective acts of harassment against Plaintiff that ultimately drove her out of the District and her profession."  *Id.* at 4-5.  Such harassment included increased scrutiny and harassment, followed by allegations of sub-par performance, a request that Plaintiff participate in a performance improvement plan, and a threatened § 3020-a disciplinary proceeding.  *Id.* at 5.  According to Plaintiff, no similar actions were taken against any male or younger, female employees.  *Id.*

To establish the fourth prong of a *prima facie* case of disparate treatment, *i.e.*, a causal relationship between the plaintiff's membership in a protected class and the adverse employment action, the plaintiff must show the adverse employment action occurred under circumstances giving rise to an inference of discrimination, which is generally accomplished by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside the protected group.'"  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'"  *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Although whether two employees are similarly situated generally presents a question of fact for the jury, *Graham*, 230 F.3d at 39 (citing cases), "[t]his rule is not absolute, [ ], and a court can properly grant summary judgment where it

is clear that no reasonable jury could find the similarly situated prong met." *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000)).  "In this analysis, there must be an 'objectively identifiable basis for comparability' between the plaintiff and the comparator employee, which includes an assessment of 'whether the conduct for which the employer imposed discipline was of comparable seriousness.'" *Zuk v. Onondaga County*, 471 Fed.Appx. 70, 71 (2d Cir. 2012) (quoting *Graham*, 230 F.3d at 40).  In the instant case, it is the requisite "objectively identifiable basis for comparability" that Plaintiff has failed to establish.

In particular, although Plaintiff's teaching was subjected to increased and unscheduled observations, resulting in her assignment to Track III placement which required Plaintiff to provide daily and unit lesson plans and copies of tests, as well as to conform to a certain method of teaching, Plaintiff fails to point to any other similarly situated teacher, *i.e.*, another teacher who was either male or younger than Plaintiff, about whom the School District had received complaints from students or their parents, yet whose teaching methods were not similarly scrutinized.  Nor has Plaintiff pointed to any other male or younger teacher who, after being placed on Track III supervision, was subsequently determined to be noncompliant with the program and offered a choice of accepting a non-teaching assignment while the School District pursued disciplinary action pursuant to N.Y. Gen. Mun. Law § 3020-a, or agree to tender resignation. Although Defendant has provided a copy of only one of the asserted "14 to 16" complaints Defendant maintains Gentile received prior to the start of the 2008-09 school

year,[34] it is significant that Plaintiff does not challenge the authenticity of that complaint

or the numerous additional complaints Defendant submitted in support of summary

judgment,[35] received by the School District between October 1 and November 17, 2008,

from students and parents of students in Plaintiff's classes complaining of Plaintiff's

teaching methods and abilities.  Insofar as Plaintiff attempts to compare herself to the

three other teachers who were on unpaid personal leaves of absence for the 2007-08

school year, and requested a second year leave of absence, which likewise was denied,

but were not subsequently subjected to teaching observations as Plaintiff was, Plaintiff

fails to establish those teachers were similarly situated because she fails to show any

evidence that the School District also received complaints about their teaching methods,

yet failed to engage in informal observations or to pursue placing such teacher on Track

III supervision.  *See, e.g., Valtchev v. City of New York*, 400 Fed.Appx. 586, 590 (2d Cir.

Nov. 15, 2010) (holding, with regard to retaliation claim, the plaintiff could not establish

causal connection between plaintiff's engagement in protected activity and adverse

employment action because unsatisfactory teaching evaluations were dated before

plaintiff filed EEOC complaint alleging employment discrimination, thereby negating

comparability).  Notably, Plainitff does not allege Defendant directed her to teach

biology in order to drive Plaintiff out because they expected Plaintiff to have trouble

teaching biology at that point in her career.  Accordingly, Plaintiff has failed to point to

any evidence establishing the fourth prong of a *prima facie* case of disparate treatment

and summary judgment on the claim should be GRANTED in favor of Defendant.

---

[34] Filed as Ptak Declaration Exh. C.
[35] Filed as Ptak Declaration Exh. D.

### 2.    Retaliation

Insofar as the Complaint can be construed as alleging a claim for retaliation based on Plaintiff's filing of the Union Grievance and her attempt to file an Internal Grievance, a *prima facie* case of retaliation requires Plaintiff "demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action.'"   *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).   "To prevail on a retaliation claim, 'the plaintiff need not prove that her underlying complaint of discrimination had merit,' *Zann Kwan v. Andalex Goup LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *Lore*, 670 F.3d at 157), "but only that it was motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful.'"   *Id.* (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).   Further, discriminatory employment retaliation claims are subject to the same *McDonnell Douglas* burden-shifting analysis as disparate treatment employment discrimination claims.   *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-04; *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); and *Reed*, 95 F.3d at 1177).

In the instant case, it is undisputed that Plaintiff's filing of the Union Grievance and attempt to file an Internal Grievance constituted protected activity, and that Defendant was aware of such activity, thus establishing the first two elements.   Whether Plaintiff suffered an adverse employment action, as well as whether any such adverse action could be attributed to Plaintiff's filing of the Union Grievance, and attempt to file the Internal Grievance, remains in contention between Plaintiff and Defendant.

As discussed in connection with Plaintiff's disparate treatment claims,

Discussion, *supra*, at 25-29, although Plaintiff has not explained how the increased

observation and Track III placement, along with the attendant requests that Plaintiff

provide Defendant with daily and unit lesson plans, and copies of her tests so altered

the conditions of her employment as to be considered adverse, there exist genuine

issues of material fact as to whether Plaintiff has established she suffered an adverse

employment action insofar as Plaintiff alleges she was constructively discharged when

she was ultimately given a choice between accepting a non-teaching assignment while

the School District pursued a § 3020-a disciplinary proceeding against Plaintiff, or

tender her resignation.  Accordingly, a genuine issue of material fact exists as to

whether Plaintiff suffered an adverse employment action.

Nevertheless, Plaintiff is unable to defeat summary judgment on her retaliation

claim because she cannot establish the required causal connection between the

protected activity and the alleged adverse employment action.  Indeed, the record

establishes that the Union Grievance Plaintiff filed is devoid of any assertion that the

School District's actions of which Plaintiff was complaining were based on Plaintiff's

gender or age.  *See*, *e.g.*, *Williams v. Time Warner, Inc.*, 440 Fed.Appx. 7, 9-10 (2d Cir.

Sept. 28, 2011) ("This Court has only required that a plaintiff provide *some* evidence of

causation – even circumstantial evidence that an adverse action taken by an employer

followed shortly on the heels *of a discrimination complaint* – in order to establish a *prima

facie* case [of retaliation]." (italics added and citing *Gorzynski*, 596 F.3d at 110)).  *See

also Manoharan v. Columbia University College and Physicians and Surgeons*, 842

F.2d 590 593 (2d Cir. 1988) (holding in addition to establishing causality, a "plaintiff

must demonstrate a good faith reasonable belief that *the underlying challenged actions of the employer violated the law.*" (italics added)).  Because the Union Grievance does not mention Plaintiff's age or gender as a reason for Defendant's actions, it logically follows that Defendant cannot be found to have taken any adverse action against Plaintiff for complaining in the Union Grievance of disparate treatment based on her age or gender.

Further, insofar as Plaintiff relies on her attempt to file an Internal Grievance, Defendant had already, by November 2008 when Plaintiff attempted to file such grievance, subjected Plaintiff to the employment actions Plaintiff challenges as adverse. In particular, Plaintiff alleges the adverse employment actions commenced in August 2008, a few days before the start of the 2008-09 school year when Gentile advised Plaintiff he had received several telephone calls from parents of students assigned to Plaintiff's classes who, based on Plaintiff's reputation, had concerns about Plaintiff's teaching ability, followed by the proffer from the School District of an 18-month leave of absence, additional assertions of complaints received after the school year's commencement regarding Plaintiff's teaching abilities, subsequent to which Gentile began observing Plaintiff's teaching and demanding Plaintiff provide various forms of documentation of her lesson plans and class preparation.  Because these alleged adverse employment events were happening for more than one month prior to Plaintiff's filing of the internal grievance, they cannot be causally related to its filing.  *See*, *e.g.*, *Valtchev*, 400 Fed.Appx. at 590 (holding causal connection between protected activity and alleged retaliatory action not established where the plaintiff's "unsatisfactory teacher evaluations" began prior to the plaintiff's filing of first employment discrimination

grievance).  Accordingly, Plaintiff cannot establish the fourth element of a *prima facie*

case of discriminatory employment retaliation, and summary judgment on such claim

should be GRANTED in favor of Defendant.


### B.    Legitimate, Non-Discriminatory Reasons

Although the undersigned is recommending summary judgment be granted on

Plaintiff's disparate treatment and retaliation claims, because the matter is before the

court for a report and recommendation, the remaining two parts of the burden-shifting

tests are addressed should the District Judge disagree with the initial recommendations

regarding the establishment of a *prima facie* case of disparate treatment or retaliation.

Assuming, *arguendo*, Plaintiff has established a *prima facie* case of disparate

treatment or retaliation, the burden would then shift to Defendant to articulate a

legitimate, non-discriminatory reason for the challenged employment decision.  *Treglia*

*v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  In support of summary judgment,

Defendant argues that its actions Plaintiff challenges, including the informal observation

of Plaintiff, followed by placing Plaintiff first on Track III, Level A supervision, and then

moving Plaintiff to Track III, Level B supervision, before offering Plaintiff a choice

between reassignment to the in-school suspension monitor position while the School

District pursued § 3020-a disciplinary action against Plaintiff or tendering her

resignation, were sufficiently supported by deficiencies in Plaintiff's teaching which were

first brought to the School District's attention prior to the commencement of the 2008-09

school year. Defendant's Memorandum at  16-17.  In opposition, Plaintiff challenges the

legitimacy of Plaintiff's reasons for placing her on Track III status and eventually

directing Plaintiff to choose between tendering her retirement, or reassignment to the in-school suspension monitor position while Defendant pursued § 3020-a disciplinary proceedings against her, arguing that the standards used by the School District in creating the negative performance evaluations have never been disclosed such that the record is devoid of any evidence establishing the evaluation methodology was standard and accepted.  Plaintiff's Memorandum at 12-14.  In further support of summary judgment, Defendant asserts that Plaintiff has not disputed any of the evidence Defendant proffers to establish its legitimate and non-discriminatory reasons for the alleged discriminatory actions Plaintiff challenges.  Defendant's Reply at 6-7.

Defendant has articulated a legitimate, non-discriminatory and non-retaliatory reason for any alleged adverse employment actions.  *See Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. Appx. 33, 35 (2d Cir. 2011) (subjecting employee, who had violated multiple company policies, to company's progressive disciplinary policy, commencing with written warning, culminating in discharge, was legitimate, non-discriminatory reason for the discharge).  Insofar as Plaintiff maintains Defendant's failure to provide the performance evaluations standards according to which Plaintiff's teaching was evaluated, such argument goes to whether Defendant's proffered reasons were mere pretext for discriminatory or retaliatory intent.

### C.     Pretext for Discrimination

Where the defendant articulates a nondiscriminatory reason for its challenged actions, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'"  *Connell v. Consolidated Edison Co. of New York, Inc.*, 109 F.Supp.2d 202,

207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-11).  Then the

plaintiff must show, "without the benefit of any presumptions, that more likely than not

the employer's decision was motivated at least in part by a discriminatory reason."  *Id.*

(citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  Plaintiff may

do this by relying on the evidence already presented to establish a *prima facie* case, as

well as any additional evidence.  *Id.*  Further, "because the fourth prong of the prima

facie case in this context is proof of circumstances giving rise to an inference of

discrimination, as a practical matter, there is little difference between the evidence that

a plaintiff would present in proving just the prima facie case and pretext in proving the

'ultimate fact of discrimination.'"  *Id.* at 208 n. 5.

      In the instant case, in opposing summary judgment, Plaintiff argues Defendant's

otherwise legitimate, non-discriminatory reasons for its challenged actions are mere

pretext for discrimination.  Plaintiff's Memorandum at 9.  Plaintiff's asserts what she

characterizes as her "precipit[ous] fall from grace," as evidence of pretext in light of 22

years of "unblemished service" with the School District, such that the asserted issues

which caused the School District to place Plaintiff on Level III supervision and eventually

recommend her resignation occurred over a time period encompassing only 1.3 % of

Plaintiff's total time with the School District.  *Id.* at 10-11.  Plaintiff also calls into

question the School District's initial denial of her request for a second year leave of

absence, only to offer Plaintiff 18 months of leave shortly after the 2008-09 school year

commenced, thereby demonstrating that the School District's stated reason for denying

the requested second year of leave, *i.e.*, that it was the School District's policy not to

grant any requests for consecutive years of personal leave of absences, was false.  *Id.*

at 11.  Plaintiff maintains nothing was ever done to alleviate the problems Plaintiff
reported regarding the acoustics in Room 420, she was never allowed to speak to any
of the parents who allegedly complained about her, Plaintiff challenges the negative
performance evaluations generated between September and November 2008, asserting
the record contains no evidence that such evaluations resulted from an objective,
accepted method of evaluating teachers, that Plaintiff's effectiveness is established by
the fact that her students earned passing grades for the first quarter, and maintains that
despite attempting to comply with the School District's demands, and that her last
evaluation showed Plaintiff was improving, "she was engineered into resigning."  *Id.*

In opposition, Defendant maintains Plaintiff's attempt to establish Defendant's
legitimate, non-discriminatory reasons are mere pretext for discrimination, does not
include any facts but, instead, consists of conclusory statements that Gentile's
conclusions were not based on his observations of Plaintiff's teaching, and the School
District's determination that Plaintiff's teaching abilities were sub-par was inconsistent
with Plaintiff's otherwise "unblemished service."  Defendant's Reply at 6-7.  Defendant
further argues, for the first time, that in contrast to Plaintiff's assertion, her "time at the
School District was not 'unblemished,'" *id.* at 7, and submits that in April 1997, Plaintiff,
then teaching at the Middle School, was asked to resign her position as Science
Department Chairperson, at which time Plaintiff made conclusory allegations of
discrimination, *id.*, and in 1998, Plaintiff was warned regarding her failure to regularly
attend mandatory Science Department and faculty meetings.  *Id.* at 7-8 (referencing
Ptak Reply Declaration Exhs. A and B).  Ptak states "[a]s a result of these and other
concerns with Mrs. Bauers-Toy's actions at CMS [the Middle School], including

concerns related to her instruction of students, plaintiff was relocated to Clarence High

School [ ] in 2001." Ptak Reply Declaration ¶ 7. Ptak further asserts that at the time of

her resignation, Plaintiff was not the oldest, female teacher at the High School, with four

other female teachers older than Plaintiff also teaching there, two of whom continued to

be employed as of that date, *i.e.*, November 28, 2012. *Id.* ¶ 8. In her sur-reply, Plaintiff

argues that taken within context, the circumstances under which Defendant induced

Plaintiff to resign establishes that Defendant was motivated by its intent to discriminate

against Plaintiff based on her age and gender. Plaintiff's Sur-Reply at 6-9. In support of

this argument, Plaintiff references that fact that the Appeals Board Decision, despite

affirming the DOL's decision denying Plaintiff's claim for unemployment benefits

because the evidence established Plaintiff had resigned from her job based on

"personal and non-compelling reasons," rather than because Plaintiff "was specifically

threatened with disciplinary proceedings based on issues of poor performance," other

evidence established "no doubt that the principal was trying to intimidate [Plaintiff] . . . ."

*Id.* at 8-9 (referencing Appeals Board Decision at 2-3).

As discussed more fully in connection with Plaintiff's hostile work environment

claim, the circumstances under which Plaintiff tendered her resignation are replete with

indications that Defendant wanted to coerce Plaintiff to resign, despite any legitimate

reason for doing so. *See* Discussion, *infra*, at 48-52. Briefly, such indications include

the School District's offer to Plaintiff on September 9, 2008, of an 18-month leave of

absence, despite insisting the School District never granted two consecutive years of

personal leave, with the expectation that Plaintiff would resign at its expiration, the

assertion that numerous complaints were received prior to the commencement of the

2008-09 school year from parents of students Plaintiff was assigned to teach, based solely on Plaintiff's "reputation" even though Plaintiff did not teach the previous year, and there is no mention of similar complaints received prior to that time, the commencement of the informal observation by Gentile which is not provided for in the CBA, the placement of Plaintiff of Track III supervision, which included requiring Plaintiff incorporate specific teaching methods into her classroom presentations, without providing any basis for such demands, and the complete absence of any evidence that the effectiveness of Plaintiff's teaching skills had previously been called into question during Plaintiff's 30-year teaching career, the last 22 of which were with Defendant.

With regard to Defendant's belated argument, raised for the first time in reply, that Plaintiff's record with the School District was not "unblemished," Defendant's Reply at 7, the court need not address arguments raised for the first time in reply papers.  *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir 2005) (district court has discretion to consider argument made for the first time in reply memorandum of law (citing *Bayway Refining Co. v. Oxygenated Marketing & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000) (reviewing for abuse of discretion district court's decision to rely on evidence submitted with moving party's reply papers)).  Moreover, even if the court were to consider the argument, the evidence Defendant submits in its support, such evidence only establishes issues of fact as to whether Plaintiff was subjected to a hostile work environment in hopes of causing her to resign.

In particular, in her letter to Middle School Principal Joel Weiss, dated April 29, 1997 ("April 29, 1997 Letter"),[36] advising of her resignation as chair of the Middle School's science department, referenced by Ptak as establishing that Plaintiff was

---

[36] Filed as Ptak Reply Declaration Exh. A.

requested to tender such resignation, Plaintiff maintains that such resignation was based solely on an accusation that she did not have "a strong and warm relationship with all of my department members," and that Plaintiff had "never been informed of any dereliction of duty, nor have I ever received any written notice(s) of any displeasure from either administrator." April 29, 1997 Letter. The January 5, 1998 letter from Weiss to Plaintiff ("January 8, 1998 Letter"),[37] regarding Plaintiff's failure to attend mandatory Science Department and faculty meetings references Plaintiff's assertions that she had health issues, but does not raise any issue with Plaintiff's teaching abilities. January 5, 1998 Letter. Accordingly, neither the April 29, 1997 Letter not the January 5, 1998 Letter calls into question Plaintiff's teaching abilities. Furthermore, not only is Ptak's statement that his "concerns related to [Plaintiff's] instruction of students," Ptak Reply Declaration ¶ 7, not supported by any evidence in the record, such statement also conflicts with High School Principal Gentile's statement that Gentile believed Plaintiff, up until her last year of teaching, was a "good employee" who "did a good job." Gentile Dep. Tr. at 40. Accordingly, such belatedly submitted evidence does not support summary judgment in favor of Defendant but, rather, merely raises questions of fact as to the credibility of Ptak's statements on this point. Accordingly, genuine questions of material fact as to whether Defendant's legitimate, non-discriminatory reasons for any adverse employment actions were mere pretext for discrimination would preclude summary judgment on Plaintiff's disparate treatment and retaliation claims, but for Plaintiff's failure to establish any causal connection between the asserted adverse employment actions.

---

[37] Filed as Ptak Reply Declaration Exh. B.

Although the circumstances under which Plaintiff tendered her resignation include numerous genuine issues of material fact as to whether Defendant's non-discriminatory reason proffered in support of Defendant's actions was legitimate or mere pretext for discrimination, in the absence of a causal connection between any adverse employment action, Plaintiff has failed to establish a *prima facie* case of disparate treatment employment discrimination based on her age or gender, or employment discrimination retaliation based on her filing of the internal complaint, requiring summary judgment in favor of Defendant on both claims.  Nevertheless, Plaintiff has established a *prima facie* case of hostile work environment, based on Plaintiff's status as an older, female worker, leading to a constructive discharge.

3.   **Hostile Work Environment**

Although not separately denominated as a claim, Plaintiff does allege that, based on the fact that she was an older, female employee, in addition to disparate treatment she was subjected to a hostile work environment which was so insufferable as to cause Plaintiff to resign.  Complaint ¶ 29.  Plaintiff thus has alleged a hostile work environment claim, based on her age plus gender, resulting in her constructive discharge.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109-110 (2d Cir. 2010) (recognizing that although pleadings did not contain specific age plus gender claim, the plaintiff had argued such claim in opposing summary judgment, which the court did not need to reach because the plaintiff had proffered sufficient evidence on her age discrimination claim to survive summary judgment, yet stating, in *dicta*, that "a plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the

fact that certain members of a protected class are not subject to discrimination, while

another subset is discriminated against based on a protected characteristic shared by

both subsets" because "where two bases of discrimination exist, the two grounds cannot

be neatly reduced to distinct components." (citing cases)).  That Defendant has

construed the Complaint as alleging a hostile work environment claim is evident from

the fact Defendant offers an argument in support of summary judgment on such claim.

Defendant's Memorandum at 19-20 (arguing that to the extent Plaintiff has pleaded a

hostile work environment claim such claim should be dismissed on summary judgment

because Plaintiff cannot establish the requisite degree of severity or pervasiveness to

which the conditions of her employment were altered by Defendant's alleged conduct).

It is significant that the criteria for establishing a hostile work environment claim,

which employs the *McDonnell Douglas* burden shifting analysis, are different than those

for a disparate treatment claim, which does not.  *See Reynolds v. Barrett*, 685 F.3d 193,

202 (2d Cir. 2012) (recognizing distinction between *McDonnell Douglas* burden-shifting

framework and hostile work environment analysis).  *See also Nichols v. Volunteers of*

*America, North Alabama, Inc.*, 470 Fed.Appx. 757, 766 & n. 1 (11th Cir. Apr. 18, 2012)

(citing cases comparing elements of hostile work environment claim, with discrimination

elements and retaliation elements under *McDonnell Douglas*).  Specifically, to establish

a hostile work environment claim, "'a plaintiff must produce enough evidence to show

that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that

is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment.'"  *Rivera v. Rochester Genesee Regional*

*Transportation Authority*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d

at 102 (further internal quotation omitted)).  "In considering whether a plaintiff has met

this burden, courts should 'examin[e] the totality of the circumstances, including: the

frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with the victim's [job] performance."  *Id.* (quoting *Hyut v. State University of New York*,

352 F.3d 733, 745 (2d Cir. 2003)).  "Moreover, the 'test has objective and subjective

elements: the misconduct shown must be severe or pervasive enough to create an

objectively hostile or abusive work environment, and the victim must also subjectively

perceive that environment to be abusive.'"  *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365,

374 (2d Cir. 2002)).  "Of course, '[i]t is axiomatic that mistreatment at work, whether

through subjection to a hostile environment or through [other means], is actionable

under Title VII only when it occurs because of an employee's . . . protected

characteristic,' such as race or national origin."  *Id.* (quoting *Brown v. Henderson*, 257

F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through

subjection to a hostile environment or through such concrete deprivations as being fired

or being denied a promotion, is actionable under Title VII only when it occurs because

of an employee's sex, or other protected characteristic." (citing *Oncale v. Sundowner

Offshore Services, Inc.*, 523 U.S. 75, 79-80 (1998)))).  As such, in opposing summary

judgment on a hostile work environment claim, the plaintiff must produce evidence "(1)

that the workplace was permeated with discriminatory intimidation that was sufficiently

severe or pervasive to alter the conditions of her work environment, and (2) that a

specific basis exists for imputing the conduct that created the hostile environment to the

employer." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.) (internal quotation omitted), *cert. denied*, 540 U.S. 1016 (2003).

As stated, in the instant case, Plaintiff has alleged Defendant's actions against Plaintiff, based on the fact that Plaintiff was the oldest, female employee within the science department, created a work environment so hostile to Plaintiff that Plaintiff chose to resign rather than be reassigned to the in-school suspension monitor position, a non-teaching position, in which Plaintiff would also be subjected to a disciplinary proceeding pursuant to N.Y. Gen. Mun. Law § 3020-a.

### a.    Discriminatory Intimidation in Workplace

With regard to the first criteria, Plaintiff points to evidence in the record that even before the 2008-09 school year commenced, she began to experience Defendant's hostility toward her insofar as, despite suffering from vocal cord edema, she was assigned to teach in Room 420, a room which many teachers had complained was acoustically deficient.    Not only does Defendant not deny such assertion, Defendant maintains that several years earlier, "baffles" were installed in the exhaust fans to muffle the noise. Defendant's Response to Plaintiff's EEOC Claim[38] at 3 n. 5.  It is significant that Plaintiff maintains, and Defendant does not dispute, that McCaddam, who is female, was the last teacher assigned to Room 420, with its poor acoustics, and taught there for the 2007-08 school year, at the end of which McCaddam retired.

On August 29, 2008, the first teacher workday of the 2008-09 school year, while attending a meeting of the biology teachers at the High School, Plaintiff was summoned to Gentile's office for a meeting with Gentile who informed Plaintiff that the

---

[38] Filed as Plaintiff's Exh. 4.

parents of several students had complained, "based solely on plaintiff's reputation," Defendant's Memorandum at 2, about having Plaintiff for a teacher and requested their children be reassigned to a different teacher.  Despite Plaintiff's request to see the complaints so as to address the issue, Gentile refused to provide the complaints to Plaintiff.  Although Plaintiff maintains Gentile told her "14 to 16" parents had complained, Plaintiff's Dep. Tr. at 38, Defendant numbered such complaints as "several," Ptak Declaration ¶ 9;  "a few," Gentile Dep. Tr. at 46; and "two, three," *id*. at 47.  Despite the disagreement as to the actual number, both Plaintiff and Defendant agree that more than one such complaint was reported, yet Defendants submitted evidence of only one such complaint.  Ptak Declaration Exh. C.

Gentile also admitted Plaintiff, upon being notified of the complaints, requested she be allowed to "reach out to the parents herself," and that Gentile responded, "Good. That's how it always was.  Reach out."  Gentile Dep. Tr. at 48.  Despite admitting the usual practice was to permit teachers to contact those parents who had complained about the teacher, Gentile did not provide Plaintiff with the information necessary to contact the complaining parents, nor did Gentile show Plaintiff the complaints, such that Plaintiff was not able to "reach out."  According to Gentile, the parents who had made the complaints had also expressed their reservations that Plaintiff may retaliate against any student whose parent had complained.  *Id*. at 48-49 (Gentile responding he did not tell Plaintiff the names of the complaining parents "[b]ecause the parents were very specific that they thought [Plaintiff] was very retaliatory and would take it out on their kid.").  On the copy of the single complaint Defendant submitted on this point, Ptak

Declaration Exh. C, on which the names of the parent and the student are redacted,

there is no mention of any concern of retaliation by Plaintiff.

On September 9, 2008, shortly after the 2008-09 school year commenced,

Plaintiff attended a meeting with Union representative Runfola who advised that Coseo

was offering Plaintiff an unpaid leave of one and a half years which, based on Plaintiff's

age of 53, would have allowed her to remain a School District employee until age 55,

when it was anticipated Plaintiff would retire.  Plaintiff's Affidavit ¶ 17.  Although the offer

was never reduced to writing, Defendant does not deny the offer was made, nor does

Defendant give any explanation for the offer which would have been contrary to the

School District's policy never to grant two consecutive year-long personal leaves of

absence. Ptak Dep. Tr. at 51, 71, 74-76 (School District Personnel Director Ptak

testifying it was the School District's policy never to grant two consecutive year-long

personal leaves of absence).  It is significant that although the offer of September 9,

2008 was never put in writing, the terms of the offer of November 17, 2008,

memorialized in the November 18, 2008 Memorandum of Agreement and accepted by

Plaintiff, are essentially the same as the September 9, 2008 offer insofar as both

provided for Plaintiff to cease teaching, in exchange for Plaintiff being provided with

health insurance through February, 2010, which was 18 months from the September 9,

2008 offer.

Once the 2008-09 school year commenced, Defendant maintains numerous

complaints were received from students and their parents regarding Plaintiff's teaching

methods, prompting Gentile to begin on September 10, 2008, random observations of

Plaintiff's classes, allegedly anticipating his observations would establish that Plaintiff's

teaching skills, in contrast to the complaints, were appropriate and effective.  Gentile

Dep. Tr. at 42 (Gentile stating that after receiving numerous complaints that Plaintiff was

not teaching her classes, "I went into the classroom, and actually I went in to defend

[Plaintiff] thinking people were picking on her, and much to my chagrin, everything

people were saying was true.").  Gentile described what he observed in Plaintiff's

classes as "dittos handed out, notes where kids would fill in the answer, and they were

to look in the book and find the answers.  So it was really a supervised study hall."  *Id*.

at 43.  It is, however, significant that although Gentile's observations of Plaintiff

commenced in mid-September 2008, of the fifteen "representative" complaints

Defendant submitted in support of Gentile's decision to observe Plaintiff's classes to

address the concerns raised in the complaints, Ptak Declaration ¶ 10,[39] the earliest

such complaint is dated October 1, 2008, almost three weeks after Gentile commenced

his observations on September 10, 2008.  Accordingly, Defendant's evidence fails to

establish that the observations resulted from complaints about Plaintiff's teaching.

The APPR does not provide for the informal observation and supervision to

which Plaintiff's teaching was subjected between September 10 and October 25, 2008,

prior to her placement on Track III supervision.  APPR at 8.  Nor does the APPR specify

the procedures to be used when a teacher is placed on Track III supervision, and

Defendant points to nothing establishing that the demands made of Plaintiff in

connection with her Track III placement were proven methods for assisting a tenured

teacher whose skills were suddenly considered subpar.  *Id*.  Further undermining

Defendant's argument that the School District was merely following its established

procedures for dealing with an experienced, tenured, teacher who seemed to have lost

---

[39]  Copies of the "representative complaints" are filed as Ptak Declaration Exh. D.

the ability or desire to teach, particularly a course, biology, Defendant knew or should

have known Plaintiff had not previously taught during her employment by the School

District, are Gentile's statements during his deposition that until the 2008-09 school

year, Gentile believed Plaintiff was a "good employee" who "did a good job," "cared

about kids," and if a conflict should arise with a student or parent, Plaintiff would "work it

out."  Gentile Dep. Tr.[40] at 40-41.  *See also* Gentile Dep. Tr. at 47 ("[Plaintiff] was a very

good teacher . . . .").  Gentile's description of Plaintiff is consistent with Plaintiff's

deposition testimony that she was not "aware of any parent or teacher concerns

regarding [her] teaching" raised either during or regarding the 2006-07 school year,

Plaintiff's Dep. Tr. at 23, which was school year immediately preceding the 2007-08

school year for which Plaintiff was on an unpaid personal leave of absence.

The complete absence of any evidence of concerns with regard to Plaintiff's

teaching prior to the 2008-09 school year is further circumstantial evidence that the

School District had orchestrated to make the environment in which Plaintiff was

teaching so hostile that Plaintiff was humiliated into tendering her resignation.  *See*

*Terry*, 336 F.3d at 135, 152-53 (supervisor's explanation that plaintiff was being passed

over for promotion because plaintiff was "quarrelsome and unexemplary" was

inconsistent with plaintiff's receipt of written commendations for his "outstanding

interpersonal skills").  *See also Rivera*, 702 F.3d at 693 (requiring Plaintiff, to establish

hostile work environment, produce evidence that workplace was "permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working

---

[40] References to "Gentile Dep. Tr." are to the page of the transcript of Gentile's deposition, portions of
which are filed as O'Brien Declaration Exh. J

environment").  Nor does Defendant attempt to explain its actions in light of the 12

letters,[41] written by 10 other High School science teachers and two students, supporting

Plaintiff abilities and professionalism as a teacher and dedicated employee.

That Defendant's conduct was motivated by the desire to have Plaintiff retire may

be construed from the fact that Defendant, after denying Plaintiff's request in April 2008

for a second consecutive year of unpaid personal leave of absence, ostensibly because

it was against the School District's policy to grant such requests, offered Plaintiff on

September 9, 2008, an 18-month leave of absence until February 2010, at which time it

was anticipated Plaintiff would resign.  It was after Plaintiff declined the offer that the

School District commenced scrutinizing Plaintiff's teaching, with Gentile observing a

class Plaintiff taught the very next day, *i.e.*, September 10, 2008.  When Plaintiff

continued to teach, Defendant, on November 17, 2008, presented Plaintiff with

essentially the same offer, *i.e.*, that the School District would continue to provide Plaintiff

with health benefits in exchange for Plaintiff's resignation.  If, however, Plaintiff chose

not to accept the offer, she would be reassigned to a non-teaching position as monitor

of in-school suspension, and be subjected to a § 3020-a disciplinary proceeding.

Significantly, Defendant does not dispute that Plaintiff was the oldest, female teacher in

the High School's science department.[42]

Simply put, there is significant evidence in the record from which a trier of fact

could determine Defendant created a hostile work environment with the intention of

forcing Plaintiff, who was the science department's oldest, female teacher, to retire from

teaching.

---

[41]  Filed as Plaintiff's Exh. 23.
[42] Although McCaddam's age is not provided, the court notes that McCaddam, who is female, retired from the science department the previous year.

b**.**     **Basis to Impute Offensive Conduct to Employer**

Despite Plaintiff's successfully establishing that she experienced a hostile work environment, Defendant would not be liable absent "a specific basis [ ] for imputing the objectionable conduct" to the School District.  *Alfano*, 294 F.3d at 373.  The record, however, contains ample evidence that the School District was well aware of the allegedly hostile circumstances under which Plaintiff was required to teach prior to tendering her resignation.

Specifically, Plaintiff's filing of the Union Grievance, and her attempt to file an Internal Grievance both served to alert the School District that Plaintiff was challenging the conditions under which she was required to work during her last few months. Significantly, the School District would have been well aware of both the Union Grievance, as well as Plaintiff's attempt to file the Internal Grievance given that Plaintiff was required to obtain the forms for the Internal Grievance from Mr. Ptak, who, at all times relevant to this action, was the School District's Director of Personnel.

Plaintiff also references her November 29, 2008 Letter, several days before her resignation became effective on December 3, 2008, in which Plaintiff requests Coseo conduct an investigation into the circumstances under which she resigned, asserting that after Plaintiff was presented in April 2008 with the School District's choice either to return to teach for the 2008-09 school year, or tender her resignation, and Plaintiff chose to return to teach, Ptak, Coseo and Gentile decided "to make me their target for the year," by subjecting her to such "negativity" as to cause Plaintiff to become ill, requiring therapy for her throat and to seek treatment from a cardiologist.  Plaintiff's

Response at 9 (referencing November 29, 2008 Letter at 3).  Plaintiff points to the fact

that of the eight teachers within the School District who had a leave of absence for the

2007-08 school year, all of whom were female, four returned to teach for the 2008-09

school year, yet Plaintiff, who was the oldest of the four returning teachers, was the only

one subjected to the increased scrutiny.  *Id.*  To summarize, there is sufficient evidence

in the record to support a fact finder's determination that the alleged offensive conduct

based on Plaintiff being an older, female teacher, may be imputed to the School District.

The record thus establishes both prongs of Plaintiff's claim that she was

subjected to a hostile work environment, and the court next considers whether the

record could support a finding that Plaintiff was constructively discharged.


### c.      Constructive Discharge

Having established there is evidence in the record from which a trier of fact could

conclude Plaintiff was subjected to a hostile work environment based on the fact that

Plaintiff was the oldest female in the High School's science department, the court

considers Plaintiff's assertion that she was constructively discharged.  "An employee is

constructively discharged when his employer, rather than discharging him directly,

intentionally creates a work atmosphere so intolerable that he is forced to quit

involuntarily."  *Terry*, 336 F.3d at 151-52 (citing *Kirsch v. Fleet Street, Ltd.*, 148 F.3d

149, 161 (2d Cir. 1998); and *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d

81, 89 (2d Cir. 1996)).  "[W]orking conditions are intolerable when, viewed as a whole,

they are 'so difficult or unpleasant that a reasonable person in the employee's shoes

would have felt compelled to resign.'"  *Id.* (quoting *Chertkova*, 92 F.3d at 89).  Plaintiff

additionally "must establish that the constructive discharge 'occurred in circumstances

giving rise to an inference of discrimination on the basis of [her] membership in [a

protected] class.'"  *Id.* (bracketed material in original).  Proof of the requisite causal

connection can be established by either direct or indirect evidence of animus based on

the plaintiff's membership in a protected class.  *See Terry* 336 F.3d at 152 (holding

genuine issues of material fact as to whether employee in plaintiff's position would have

felt, as a result of abusive work environment, compelled to resign as well as whether

such work environment was related to plaintiff's race and age where plaintiff established

evidence of pervasive, unabated harassment by supervisors, was threatened with

disciplinary charges and, upon transferring to another department, was greeted by new

supervisor who expressed surprise plaintiff agreed to the reassignment).

　　　For purposes of an employment discrimination claim, an employee is

constructively discharged when her employer, rather than directly discharging her,

intentionally creates a work atmosphere so intolerable that she is involuntarily forced to

quit.  *Terry*, 336 F.3d at 151-52.  If the plaintiff cannot show specific intent by the

employer, she is required to demonstrate at least that the employer's actions were

deliberate, and not merely negligent or ineffective.  *Id.*  A constructive discharge

employment discrimination claim is analyzed according to an objective standard,

requiring the plaintiff demonstrate that working conditions were so intolerable that a

reasonable person would have felt compelled to resign, and that the constructive

discharge occurred in circumstances giving rise to an inference of discrimination on the

basis of her membership in a protected class.  *Rivera*, 702 F.3d at 685.

In the instant case, a trier-of-fact could find that the choice Plaintiff was ultimately given to either tender her resignation in exchange for Defendant providing her with health insurance through February 2010, or accept reassignment to a non-teaching position, which would have been a demotion, and be subjected to a § 3020-a disciplinary proceeding, does not support a finding that Plaintiff voluntarily chose to resign.  Accordingly, the record establishes an issue of fact as to whether Plaintiff was constructively discharged from her teaching position with the School District.

### d.   *Faragher/Ellerth* **Affirmative Defense**

Defendant asserts that even if Plaintiff has established a viable employment discrimination claim based on a hostile work environment, such claim would be barred by the *Faragher/Ellerth* defense because claims of a hostile work environment or constructive discharge do not constitute the requisite "tangible employment action" taken by the School District.  Defendant's Memorandum at 22-23.  In opposition, Plaintiff argues the *Faragher/Ellerth* defense is barred by the Union Grievance Plaintiff attempted to file on October 9, 2008, and her attempt in early November 2008 to file an internal grievance.  Plaintiff's Memorandum at 16-18.  In further support of summary judgment, Defendant argues any retaliation claim alleged by Plaintiff "should be dismissed and it should not serve as a basis for disposing of the School District's *Faragher/Ellerth* defense."  Defendant's Reply at 8.

The *Faragher/Ellerth* defense, named for two cases decided the same day, including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), provides that "an employer is strictly

liable for supervisory harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing *Faragher*, 524 U.S. at 765, and *Ellerth*, 524 U.S. at 808).  When, however, there is no tangible employment action, the employer may raise as an affirmative defense to liability, subject to proof by a preponderance of the evidence, "'(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Ellerth*, 524 U.S. at 765, and citing *Faragher*, 524 U.S. at 807).  Nevertheless, in *Suders*, the Supreme Court specifically held that a constructive discharge is a "tangible employment action" such that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge. . . ." *Suders*, 542 U.S. at 140-41.

In the instant case, Plaintiff having established issues of fact as to whether she was subjected to a hostile work environment based on her age plus gender, resulting in her constructive discharge, Defendant is unable to raise the *Faragher/Ellerth* defense as an affirmative defense.  *Suders*, 542 U.S. at 140-41.  Accordingly, summary judgment on Plaintiff's hostile work environment claim should be DENIED.

## **CONCLUSION**

Based on the foregoing, Defendant's Motion (Doc. No. 20), should be GRANTED in part, and DENIED in part.  Plaintiff is hereby directed to file an amended complaint consistent with this Report and Recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:          February 6, 2014
                    Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     February 6, 2014
           Buffalo, New York